UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CHERYL A. FLYNN,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )          Action No.  2:18-cv-502
                                    )
MID-ATLANTIC MARI-TIME ACADEMY,)
                                    )
        Defendant.                  )

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Mid-Atlantic Mari-time Academy's ("Defendant" or "the Company") Motion for Summary Judgment.  ECF No. 15.  In this action, Plaintiff Cheryl A. Flynn ("Plaintiff") alleges that her former employer, the Defendant, discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 791, when she was terminated from employment. ECF No. 1 at 5.  The Motion was referred to the undersigned for Report and Recommendation by the District Judge.  ECF No. 39.  The matter having been fully briefed, the undersigned issues this Report and Recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule ("Local Rule") 7(J).  For the reasons set forth below, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment, ECF No. 15, be **GRANTED**, and Plaintiff's Complaint, ECF No. 1, be **DISMISSED WITH PREJUDICE**.

### I. PROCEDURAL BACKGROUND

On March 5, 2019, Defendant filed a Motion for Summary Judgment.  *See* ECF No. 15. Defendant also submitted a memorandum in support of its Motion, to which Defendant attached

the following: (i) deposition of Edward Joseph Nanartowich; (ii) deposition of Plaintiff; (iii) deposition of Arthur H. Goldman, Jr.; (iv) deposition of Farrah Monique Flores; (v) letter from Plaintiff to the ADA Law Administrators or Attorney General; (vi) Plaintiff's medical record(s); (vii) Plaintiff's answers to Defendant's second set of interrogatories; (viii) note(s) from Plaintiff; (ix) letter to Arthur O'Neill; (x) Declaration of Wayne Handley, a lieutenant in the Norfolk Police Department; (xi) email chain between Plaintiff and Wayne Handley; (xii) email chain between Plaintiff and Facebook; (xiii) deposition of Mary Lou Diaz; (xiv) deposition of Randall C. Spangler; (xv) email chain(s) between Plaintiff and FCC Complaints; (xvi) Plaintiff's answers to Defendant's first set of interrogatories; (xvii) City of Virginia Beach police reports; (xiii) Temporary Detention Order for Plaintiff; (xix) TowneBank printout(s) from Defendant; (xx) email from Arthur Goldman to Plaintiff; (xxi) Plaintiff employee notes; (xxii) Defendant's *Employee Handbook*, "Leave and Time Off" and "Ending Employment"; (xxiii) letter from Nanartowich to Bruder Counseling Center; (xxiv) Defendant's objections and answers to the Plaintiff's interrogatories; (xxv) Declaration of Farrah Flores; (xxvi) Merit Solutions ticket; (xxvii) recommendation letter from Nanartowich regarding Plaintiff; (xxviii) email chain between Plaintiff and Nanartowich; (xxix) Plaintiff's request for mileage reimbursement from Defendant; (xxx) email from TowneBank to Farrah Flores; and (xxxi) email from TowneBank to Farrah Flores. *See* ECF No. 16; *see also* ECF No. 16, attachs. 1-55.

On March 26, 2019, following an extension of time granted by the Court, ECF No. 25, Plaintiff filed a Brief in Opposition ("Opposition") to Defendant's Motion for Summary Judgment, ECF No. 33. Plaintiff attached the following in support: (i) deposition of Arthur H. Goldman, Jr.; (ii) recommendation letter from Nanartowich regarding Plaintiff; (iii) deposition of Edward Joseph Nanartowich; (iv) deposition of Plaintiff; (v) audio recording of termination meeting; (vi) letter

from Lewis J. Taylor, Ph.D., to Plaintiff's counsel; and (vii) affidavit of Plaintiff. *See id.*, attachs. 1-7.

On April 1, 2019, Defendant filed a Reply in Support of its Motion for Summary Judgment ("Reply"). ECF No. 37. Defendant attached the following in support of its motion: (i) deposition of Arthur H. Goldman, Jr.; and (ii) deposition of Edward Joseph Nanartowich. *Id.*, attachs. 1-2. On the same date, Defendant also filed Rule 56(c) Objections to Evidence and Various Statements in Plaintiff's Summary Judgment Affidavit. ECF No. 38. The District Judge then referred the Motion to the undersigned on April 5, 2019, for a Report and Recommended disposition. ECF No. 39.

In compliance with the Court's Order of April 9, 2019, ECF No. 41, on April 19, 2019, Plaintiff filed a supplemental memorandum "directly disputing or admitting the 52 purported material facts Defendant contends are not in dispute, citing such disputed parts to the record." ECF No. 50 at 1. As such, Defendant's Motion for Summary Judgment, ECF No. 15, is ripe for recommended disposition.

## II. STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A court should grant summary judgment if the nonmoving party, after adequate time for discovery, has failed to establish the existence of an essential element of that party's case, on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat a motion for summary judgment, the nonmoving party must go beyond the facts alleged in the pleadings

and instead rely upon affidavits, depositions, or other evidence to show a genuine issue for trial. *See id.* at 324. Conclusory statements, without specific evidentiary support, are insufficient. *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998). Rather, "there must be evidence on which the jury could reasonably find for the [party]." *Anderson*, 477 U.S. at 252. A party opposing summary judgment must present more than "a scintilla of evidence." *Id.* at 251.

Importantly, under Rule 56, the evidence proffered, either in support of or in opposition to the summary judgment motion, must be admissible. *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993); *see also, Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) *holding modified by Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420 (4th Cir. 2000) (holding that, in opposing a defendant's motion for summary judgment, "[t]he summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial.").

Rule 56 quite clearly lays out the procedure for seeking and opposing summary judgment. Apropos to Defendant's Motion and Plaintiff's Opposition, Rule 56(c)(1) specifically provides that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," and references specific examples of admissible evidence, including declarations. Rule 56(c)(3) provides that "[t]he court need consider only the cited materials, but it may consider other materials in the record." Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Rule 56(e) provides that if a party fails to address another party's assertion of

fact as required by Rule 56(c), the court may, *inter alia*, give that party an opportunity to properly address the fact, consider the fact undisputed for purposes of the motion, or grant summary judgment if the motion and supporting materials demonstrate that the movant is entitled to it. Finally, Eastern District of Virginia Local Civil Rule 56(b) provides: "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. Civ. R. 56(b).

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS

The Court has fashioned its undisputed material facts from those facts put forth by Defendant consistent with E.D. Va. Loc. Civ. R. 56(b).[1] There do not appear to be any disputes regarding facts necessary and material to resolution of the instant case.[2] As such, this Court resolves Defendant's Motion for Summary Judgment, ECF No. 15, pursuant to the following undisputed material facts:

Defendant is a maritime training school. ECF No. 16 at 2, Def.'s SOF ¶ 1. Most of Defendant's employees are veterans, and at least one other employee besides Plaintiff has had Post-Traumatic Stress Disorder ("PTSD"). *Id.*; *see also id.*, attach. 1 at 36-37. From September 2012 until September 2017, Plaintiff worked as Defendant's comptroller, a position of importance. *Id.* at 3, Def.'s SOF ¶ 3. During the relevant timeframe, Mr. Edward Nanartowich held the position of President, *id.* at 3, Def.'s SOF ¶ 2, and Mr. Arthur Goldman held the position of CEO, *id.* at 11, Def.'s SOF ¶ 30. Goldman is married to Mrs. Lee Goldman, ECF No. 33, attach. 4 at 7, who is

---

[1] Factual findings are crafted primarily from those proffered in Defendant's memorandum in support of its Motion for Summary Judgment, ECF No. 16, and Defendant's Reply in Support of the Motion, ECF No. 37, which Plaintiff has not contested. To the extent that Plaintiff contests those facts or provides additional facts, either in Plaintiff's Opposition, ECF No. 33, or Plaintiff's Memorandum Directly Disputing or Admitting the 52 Purported Material Facts, ECF No. 50, those facts are also addressed herein.

[2] Defendant and Plaintiff have both proffered many facts that are in dispute. Because not all facts are material to the outcome of this case, some facts are not discussed.

not an employee of the Company, *id.*, attach. 3 at 32.[3]  At some point prior to Plaintiff's discharge,

Plaintiff allegedly overheard Mrs. Goldman comment that "people with PTSD . . . are unstable and

can't be trusted."[4]  *Id.*, attach. 4 at 12-13.

Plaintiff experienced medical issues and was open with Defendant regarding those issues

throughout her employment. ECF No. 16 at 3, Def.'s SOF ¶ 4.  When Plaintiff was hired in 2012,

she disclosed her fibromyalgia diagnosis.  *Id.*  Defendant was also aware of Plaintiff's PTSD-

symptomatic behavior prior to any official PTSD diagnosis.[5]  *See* ECF No. 33, attach. 6 at 1 (noting

that Plaintiff's anxiety and panic attacks were "likely related to unexpressed PTSD").  As early as

December 2015, Plaintiff began experiencing "anxiety with frequent panic attacks," which

Plaintiff disclosed to Defendant at the time, including the fact that she had been hospitalized.  *Id.*

at 4, Def.'s SOF ¶ 5 (quoting *id.*, attach. 6 at 3).  In July of 2017, Plaintiff told Nanartowich that

she had been having suicidal thoughts.  ECF No. 33, attach. 4 at 28.  Plaintiff also had disclosed

to Nanartowich and Goldman that she was experiencing great stress and anxiety.  *Id.*, attach. 4 at

8-10.  Furthermore, Plaintiff disclosed to Defendant that she was having panic attacks that made

her feel "like an elephant [was] sitting on [her] chest."  *Id.*, attach. 4 at 8.  In June or July of 2017,

---

[3] Plaintiff asserts that "Nanartowich was under Lee Goldman's influence, even though she had no official position with the Company." ECF No. 33 at 19, Pl.'s SOF ¶ R.  Further, Plaintiff asserts that Mrs. Goldman was "permitted by CEO Goldman to influence company affairs[,]" *id.* at 2, and that Goldman had a "history of threatening Plaintiff's job if she challenged the authority" of Mrs. Goldman, *id.* at 10.  However, because there is no direct evidence that Mrs. Goldman spoke to either Nanartowich or Goldman regarding Plaintiff's diagnosis of PTSD prior to Plaintiff's termination, the Court need not determine the extent of Mrs. Goldman's influence.

[4] Much of Plaintiff's theory of the case is derived from Mrs. Goldman's perceived animus against individuals with PTSD based upon this comment. *See* ECF No. 33 at 10.  However, this comment is hearsay, *see* Fed. R. Evid. 801, 802, and does not fall under any relevant hearsay exception, *see* Fed. R. Evid. 803.  Therefore, the Court does not consider Mrs. Goldman's comment or her alleged animus in the resolution of this Motion.

[5] Hereinafter, "PTSD-symptomatic behavior" is a collective term used generally to refer to both Plaintiff's symptoms and any behavior derived from those symptoms.  Plaintiff characterizes her PTSD "symptoms" as including, but not limited to, anxiety, suicidal thoughts, and panic attacks. *See* ECF No. 33 at 11.  Plaintiff also asserts that Defendant was aware of Plaintiff's "pre-existing symptomatic behavior." *Id.* at 12.  Plaintiff notes that "substantially all of the criticisms of [Plaintiff] by Nanartowich and Goldman relate to the symptoms of [Plaintiff's] disability[,]" *id.* at 16, referring to Defendant's claims regarding Plaintiff's beliefs in 2017, *see id.*  Defendant also defines the beliefs that Plaintiff expressed in 2017 as related to her mental health. *See* ECF No. 16, Def.'s SOF ¶ 25; *see also* ECF No. 37 at 20.

Plaintiff told Nanartowich that her sister thought she might have PTSD.[6] ECF No. 16, attach. 2 at 119-120.

Beginning in early 2017,[7] Plaintiff expressed the following beliefs to her coworkers and supervisors: (i) someone had hacked her phone and computer; (ii) someone was manipulating her passwords; (iii) someone had stolen her identity; (iv) someone had gone through her home; (v) unidentified callers were breathing into the phone; (vi) her neighbors were involved with drugs; (vii) she was hearing voices; and (viii) she was hearing a buzzing noise. *Id.* at 9-10, Def.'s SOF ¶ 25. For some of these beliefs, Plaintiff submitted complaints to law enforcement agencies, including the Virginia Beach Police, *id.* at 5, Def.'s SOF ¶ 10, and the FBI, *id.* at 6, Def.'s SOF ¶ 14. Plaintiff also believed that she could hear people talking about her through the walls and ceiling at the office and at her apartment. *Id.* at 7, Def.'s SOF ¶ 15.

Between June 26, 2017, and August 26, 2017, Plaintiff was hospitalized three times for reported panic attacks. *Id.* at 7-8, Def.'s SOF ¶¶ 18-21. During the first hospitalization, Plaintiff's doctor reported "mild delusions" and a "good deal of obsessive thinking[.]" *Id.* at 7-8, Def.'s SOF ¶ 18 (quoting *id.*, attach. 20 at 2). On August 26, 2017, Plaintiff was transported to Carilion Roanoke Memorial Hospital pursuant to a temporary detention order issued by a Virginia Beach magistrate. *Id.* at 8, Def.'s SOF ¶ 22. According to Plaintiff's expert, Plaintiff's disorders— including PTSD[8]—"adversely affect[ed] [Plaintiff's] major life activities[.]" ECF No. 33, attach. 6 at 1. Defendant was aware of at least her hospitalization in August with Sentara Princess Anne

---

[6] When this conversation occurred, Plaintiff had not been officially diagnosed with PTSD. *See* ECF No. 16, attach. 2 at 120 ("I had no idea what PTSD was . . . I didn't know like a regular person could get PTSD."); *see also* ECF No. 33, attach. 4 at 11. Plaintiff contends that she officially disclosed her PTSD diagnosis to Defendant on September 8, 2017, *see* ECF No. 33 at 2 (citing *id.*, attach. 4 at 12), which Defendant disputes, *see* ECF No. 16 at 3, Def.'s SOF ¶ 4. However, because the parties agree that Defendant was aware of Plaintiff's PTSD-symptomatic behavior, regardless of the date of her official diagnosis, *see supra* note 5, this dispute is not material.

[7] The exact timeline for each of Plaintiff's beliefs is not established in the record. *See* ECF No. 16 at 5 n.3.

[8] The exact date of Plaintiff's diagnosis with PTSD has not been provided to the Court; however, Plaintiff has been officially diagnosed with PTSD. *See* ECF No. 33, attach. 6 at 1.

Hospital. *See id.*, attach. 3 at 20. When Plaintiff informed Nanartowich that she was seeing a doctor, Nanartowich appeared "concerned[.]" ECF No. 16, attach. 2 at 120.

Throughout early 2017, Defendant provided Plaintiff with assistance regarding her health issues and her personal life. *Id.* at 10, Def.'s SOF ¶ 27. When Plaintiff's beliefs caused her to move apartments, *see id.* at 5, Def.'s SOF ¶¶ 10-11, Nanartowich offered to put Plaintiff in a corporate apartment, spoke with the property manager, and signed Plaintiff's lease application under Defendant's name, *id.* at 10, Def.'s SOF ¶ 28. Nanartowich also paid Plaintiff two cash advances to help with moving expenses: the first in the amount of $1,675, *id.* at 10-11, Def.'s SOF ¶ 28, and the second in the amount of $500, *id.* at 11, Def.'s SOF ¶ 29. On July 3, 2017, Goldman referred Plaintiff to his personal psychiatrist. *Id.* at 11, Def.'s SOF ¶ 30. At about the same time, Nanartowich and Goldman informed Plaintiff that the Company would pay for her counseling. *Id.* at 11, Def.'s SOF ¶ 31. Nanartowich wrote a letter to this effect to Bruder Counseling Center. *Id.* at 13, Def.'s SOF ¶ 36.

Shortly thereafter, Nanartowich recommended to Goldman that the Company provide Plaintiff with six weeks of paid leave because they wanted "to keep her there in place" and "were willing to put a lot of money and attention to her well-being." *Id.* at 12, Def.'s SOF ¶ 33 (quoting *id.*, attach. 1 at 22). On July 7, 2017, Nanartowich and Goldman offered Plaintiff six weeks of paid leave. *Id.* at 13, Def.'s SOF ¶ 34. Defendant's policy only allowed for seven days of paid vacation and did not allow for paid sick days. *Id.*, Def.'s SOF ¶ 35. Plaintiff accepted the leave, *id.*, Def.'s SOF ¶ 34, but she waited approximately six weeks to begin the leave, *id.*, Def.'s SOF ¶ 37. In the interim, she was not denied time off to attend medical and counseling appointments. *Id.* Plaintiff cited her health as her reason for accepting Defendant's offer. *Id.*, Def.'s SOF ¶ 34.

Plaintiff did quality work for Defendant prior to the events in dispute.  *See* ECF No. 33, attach. 3 at 13 ("The work that she's done in that five-year span was great").  Defendant also did not document any deficiencies in Plaintiff's work during her five-year employment span with Defendant.[9]  *See id.*, attach. 3 at 23.  However, Plaintiff voiced concerns to her doctors regarding the quality of her recent work.  *See* ECF No. 16 at 13, Def.'s SOF ¶ 34 (quoting *id.*, attach. 12 at 3) ("[Plaintiff] was concerned that she may be making mistakes[.]"); *id.* at 8-9, Def.'s SOF ¶ 23 (quoting *id.*, attach. 35 at 2) ("[Plaintiff] mentioned that . . . [she] had to step down from her position because her symptoms became so bad[.]").  In addition to Plaintiff's own concerns, Nanartowich observed the following regarding Plaintiff's recent job performance:

> So things at the office were not being done satisfactorily.  We could sense that for some time.  We figured she needed a couple of things.  She needed time off and she needed an assistant – or not an assistant but a coworker in that office.

*Id.*, attach. 1 at 9.

In June 2017, Defendant informed Plaintiff that it would be hiring someone to help her.  *Id.* at 14, Def.'s SOF ¶ 38.  In the meeting, "both Nanartowich and [Plaintiff] expressed concern that she was not functioning well on the job."  *Id.*  Defendant hired a full-time bookkeeper, and Defendant also posted an advertisement on Craigslist for a full-time accounting position.  *Id.*, Def.'s SOF ¶ 39.  On July 25, 2017, Farrah Flores was hired for that full-time accounting position.  *Id.*  Nanartowich met with Plaintiff and Flores twice in the week prior to Plaintiff beginning her six-week leave—first to tell Plaintiff to transition access to Flores, and second to tell Plaintiff to not worry about the Company during her leave.[10]  *Id.*, Def.'s SOF ¶ 40.

---

[9] However, because Defendant "didn't have a quality management system put in place[,]" documenting deficiencies in performance was not "part of [Defendant's] standard operating procedure[.]"  ECF No. 33, attach. 3 at 23.
[10] *See infra* note 11.

Less than three weeks into her paid leave, Plaintiff returned to the office twice.[11] *See id.* at 15-16, Def.'s SOF ¶¶ 42, 44. Plaintiff returned first on Wednesday, September 6, 2017. *Id.* at 15, Def.'s SOF ¶ 42. Before Plaintiff arrived, Nanartowich had logged into Plaintiff's workstation to check the accounting email, but after Plaintiff left, neither Nanartowich nor Flores could access Plaintiff's workstation.[12] *Id.* Nanartowich submitted an IT ticket that read, "Can you tell me what [Plaintiff]'s password is? She just changed it and I can't reach her." *Id.* (quoting *id.*, attach. 47 at 2).

One of the comptroller's job responsibilities included maintaining the TowneBank operating bank account. *Id.* at 3, Def.'s SOF ¶ 3. Prior to September 7, 2017, Flores—as acting comptroller—had not experienced any difficulty accessing the TowneBank online portal. *Id.* at 15-16, Def.'s SOF ¶ 43. However, Flores was unable to access her TowneBank profile on the morning of September 7, 2017.[13] *Id.* at 16, Def.'s SOF ¶ 43. The password change "isolated the incumbent bookkeeper [from] doing her job." *Id.*, attach. 1 at 7. At Nanartowich's direction, Flores contacted TowneBank to determine how her password had been changed. *Id.* at 16, Def.'s SOF ¶ 45. She left a voicemail, and the following day, TowneBank's IT Department informed

---

[11] Defendant alleges that Plaintiff "violated Nanartowich's instructions not to come back to the office during her six weeks of paid leave." ECF No. 16 at 23; *see also id.*, attach. 1 at 7. However, Plaintiff disputes that she violated "any 'directive' or suggestion" that she stay away from the office, alleging that she and Nanartowich "agreed it would be best if [she] returned to work after three, rather than the six, weeks that had been offered" because Flores could not handle the job completely in Plaintiff's absence. ECF No. 50 at 8 (quoting ECF No. 33, attach. 7 at 5 ¶ 11). The materiality of this dispute is resolved at *infra* § IV.C.1.b.

[12] Although Plaintiff disputes that Nanartowich and Flores were unable to access the workstation, she bases that dispute on her claim that Nanartowich could have reached her and that "no calls were placed to [her]." ECF No. 50 at 9 (quoting *id.*, attach. 7 at 6 ¶ 13). Whether Nanartowich could have contacted Plaintiff for assistance is not relevant to Nanartowich's inability to physically log onto the workstation because it does not reflect on Nanartowich's honest belief that Plaintiff did in fact change the workstation password.

[13] Defendant alleges that when Flores was unable to log in her TowneBank profile, the Company was left "without access to the TowneBank account." ECF No. 16 at 16, Def.'s SOF ¶ 43. Plaintiff claims that the Company was not left without access "merely because Flores could not log in" because Nanartowich had a login and all other employees with a signature card had "conventional access" to the account. ECF No. 50 at 10 (quoting ECF No. 37, attach. 7 at 6 ¶ 14). Even though Plaintiff and Defendant disagree about whether the password change caused Defendant to lose general access to its accounts, the parties agree that the password change prevented Flores, the acting comptroller, from accessing the account; because this had the practical effect of leaving the company without a comptroller who could perform her duties, it is immaterial whether other employees could have accessed the account.

Nanartowich and Flores that the request to change Flores's password had been submitted by Plaintiff's username (Cflynn9). *Id.* Nanartowich did not have any doubt that Plaintiff had changed Flores's TowneBank password. *Id.*, Def.'s SOF ¶ 47. Goldman did not speak with any TowneBank personnel. *See* ECF No. 33, attach. 4 at 3.

Later that week, Plaintiff again returned to work. *See* ECF No. 16 at 16, Def.'s SOF ¶ 44. When Nanartowich questioned Plaintiff regarding the password change, Plaintiff denied it, but Nanartowich believed her denial was "disingenuous." *Id.*, attach. 1 at 14-15. Nanartowich made the decision to terminate Plaintiff's employment, and he informed Goldman of his decision on September 8 or September 9, 2017.[14] *Id.* at 17, Def.'s SOF ¶ 48. Nanartowich told Goldman that Plaintiff was being discharged "based on the information provided to him by TowneBank." *Id.*

On Monday, September 11, 2017, Goldman and Nanartowich met with Plaintiff in a termination meeting. *Id.* at 17, Def.'s SOF ¶ 48; ECF No. 33, attach. 4 at 20. Plaintiff recorded the meeting. ECF No. 33, attach. 4 at 22. During the meeting, Nanartowich stated that "until lately[,] [Plaintiff] ha[d] done a fantastic job" at the Company. *Id.*, attach. 3 at 9 (quoting ECF No. 16, attach. 5 (audio recording on file with court)). He also promised her a high recommendation in the future, *id.*, attach. 3 at 10, and called her "loyal[,]" *id.*, attach. 4 at 18. However, Nanartowich told Plaintiff that she was being terminated for "several reasons[.]" ECF No. 16, attach. 1 at 7. Those reasons included returning the office before the six-week leave expired, and the password changes. *See id.*, attach. 1 at 7-8.

---

[14] Defendant alleges that employee terminations were Nanartowich's responsibility; therefore, Nanartowich made the decision, and Goldman agreed with Nanartowich's decision. ECF No. 37 at 8. Plaintiff alleges that "Nanartowich and Goldman decided . . . to terminate [Plaintiff]." ECF No. 33 at 2 n.5 (citing *id.*, attach 1 at 9:5-13). First, Defendant's and Plaintiff's assertions are not necessarily incompatible because both Nanartowich and Goldman were unified in their position that Plaintiff should no longer work for the Company. Second, even if Defendant and Plaintiff genuinely dispute the level of involvement that Goldman had in the decision-making process, it is immaterial because Plaintiff has not alleged that either Nanartowich or Goldman had any discriminatory bias themselves against individuals with PTSD.

After Plaintiff's termination, Defendant provided Plaintiff with a month's severance pay, condition-free, even though Defendant's employee handbook did not provide for severance. *Id.* at 17, Def.'s SOF ¶ 49. Defendant also paid for four of Plaintiff's counseling sessions following her termination. *Id.*, Def.'s SOF ¶ 51. Further, Nanartowich wrote Plaintiff a recommendation letter that included language Plaintiff had requested and which Plaintiff used in all her job applications. *Id.*, Def.'s SOF ¶ 50. The letter did not reference any unsatisfactory behavior. *See* ECF No. 33, attach. 2. Plaintiff provided the letter to every potential employer, and the letter may have helped her receive subsequent employment. *Id.*, Def.'s SOF ¶ 50; *see also id.*, attach. 2 at 66.

After Plaintiff's discharge, TowneBank provided Defendant with a user activity log. *Id.* at 17, Def.'s SOF ¶ 52. The log showed that Plaintiff's username had attempted to log in from an unidentified location, triggering a security check; after Plaintiff's username had responded to a security code sent to a device, Plaintiff's username had affected a password change for Flores's username. *Id.* at 17-18, Def.'s SOF ¶ 52.

## IV. ANALYSIS

On September 21, 2018, Plaintiff filed suit, contending that she had been dismissed in violation of the ADA because of her PTSD diagnosis. ECF No. 1 at 5. The ADA prohibits an employer from discriminating against qualified individuals with disabilities. *See Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 430 (4th Cir. 2015) (citing 42 U.S.C. § 12112(a)-(b)). "[A] plaintiff has two means of showing disability discrimination under the ADA: (1) through direct and indirect evidence, or (2) through the *McDonnell Douglas* burden-shifting framework." *Baker v. City of Chesapeake*, 644 F. App'x 222, 223 (4th Cir. 2016) (internal quotation marks omitted) (quoting *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015)). Courts "have long observed a strict distinction between claims proceeding with direct evidence and those

proceeding under the *McDonnell Douglas* framework." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004)). In the instant case, neither party has alleged that there is direct evidence of discrimination.[15] *See* ECF 16 at 19; ECF No. 33 at 8.

Therefore, Plaintiff must establish her case under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). When applied to "the summary judgment . . . stage . . . these approaches merely serve to inform a court's evaluation of the allegations." *Williams v. Balt. Cty.*, No. ELH-13-03445, 2016 U.S. Dist. LEXIS 32124, at *47 (D. Md. Mar. 11, 2016) (citing *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014)). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination on a wrongful termination claim. *See McDonnell Douglas Corp.*, 411 U.S. at 807; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995) ("[T]he *McDonnell Douglas* scheme of proof does apply to appropriate claims under the ADA."). To establish a *prima facie* case under the ADA for discrimination by termination of employment, a plaintiff must show that: (i) she was a qualified individual with a disability; (ii) she was discharged; (iii) she met her employer's legitimate expectations at the time of her discharge; and (iv) the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001) (citing *Ennis*, 53 F.3d at 58). "[T]he prima facie case . . . is an evidentiary standard, not a pleading requirement." *Williams*, 2016 U.S. Dist. LEXIS 32124, at *47 (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002)).

If the plaintiff does establish a *prima facie* case, then "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."

---

[15] *See infra* § IV.A.3.a. Even if the Court were to consider Mrs. Goldman's alleged comments regarding persons with PTSD, her comments would not constitute direct evidence of discrimination.

*Ennis*, 53 F.3d at 58. To meet this burden, the defendant "need not persuade the court that it was actually motivated by the proffered reasons, but it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

If the defendant meets this burden, the plaintiff is given an opportunity to show that the defendant's "stated reason . . . was in fact pretext." *McDonnell Douglas Corp.*, 411 U.S. at 804. To demonstrate pretext, the plaintiff must show that her disability was the "but-for" cause of her discharge. *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235 (4th Cir. 2016) (citing 42 U.S.C. § 12112(a)). To determine pretext, the Court must evaluate (i) whether Plaintiff has established that Defendant's explanation was not the true explanation for Plaintiff's termination, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000); (ii) whether Plaintiff has established that there is evidence sufficiently probative of discrimination, *see Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 528 (E.D. Va. 2017) (quoting *Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2004)); (iii) whether Defendant has proffered any factors supportive of Defendant's case, *see Reeves*, 530 U.S. at 148-49; and (iv) whether Plaintiff has met her "ultimate burden of proving that she has been the victim of intentional discrimination," *Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 599 (E.D. Va. 2015) (quoting *Ennis*, 53 F.3d at 58).

Throughout the analysis, "[c]ourts must . . . resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination *vel non*.'" *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2009) (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (emphasis in original).

## A.  Plaintiff's *Prima Facie* Case

To establish her *prima facie* case, Plaintiff must demonstrate that (i) she was a qualified individual with a disability; (ii) she was discharged; (iii) she met Defendant's legitimate expectations at the time of her discharge; and (iv) the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Haulbrook*, 252 F.3d at 702 (citing *Ennis*, 53 F.3d at 58).  Plaintiff was employed by Defendant from 2012 until September 11, 2017, when Plaintiff was discharged. *See* ECF No. 16 at 3, Def.'s SOF ¶ 3; *id.* at 17, Def.'s SOF ¶ 48. As Plaintiff has established prong two of her *prima facie* case, or that she was discharged by Defendant, the Court need only determine whether Plaintiff has proffered sufficient evidence to establish the remaining three elements.

### 1. Whether Plaintiff was a Qualified Individual with a Disability under the ADA

To establish her *prima facie* case, Plaintiff must demonstrate she is qualified individual with a disability under prong one.  As a threshold matter, to qualify for protection under the ADA, the Plaintiff must establish that she had a disability as defined by the ADA. *See* 42 U.S.C. §§ 12102(1)(A), (2)(A) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual").  Plaintiff proffers that she "experience[d] panic attacks and ha[d] been diagnosed with PTSD[.]" ECF No. 1 at 2 ¶ 8; *see also* ECF No. 33 at 1 (claiming that Plaintiff "was terminated because of a disability, namely . . . PTSD").  PTSD can constitute a disability under the ADA. *See Johnson v. JP Morgan Chase & Co.*, No. 16-1632, 2017 U.S. Dist. LEXIS 51243, at *17 (W.D. La. 2017) (finding that PTSD, by definition, means functional capacity is significantly impacted, and noting that the law has changed since *Hamilton v. Southwestern Bell Telephone Company*, 136 F.3d 1047, 1050 (5th Cir. 1998), which held that PTSD is not a disability under the ADA unless it substantially limits a major life

activity). Furthermore, according to Plaintiff's expert, her PTSD substantially affected her life activities. *See* ECF No. 33, attach. 6 at 1. In addition to having a disability, the individual's employer must be aware of the disability. *See Jones v. UPS*, 214 F.3d 402, 406 (3d Cir. 2000) ("[A]n axiom of any ADA claim . . . [is] that the employer be aware of the disability."). Because Defendant was aware of Plaintiff's PTSD-symptomatic behavior throughout the relevant period,[16] Defendant perceived Plaintiff as having a disability.

Additionally, Plaintiff must prove she is a qualified individual under the ADA. *See* 29 C.F.R. § 1630.2(m). A person is qualified if "the individual satisfies the requisite skill, experience, education and other job-related requirements . . . and, with or without reasonable accommodation, can perform the essential functions of such position." *Id.* Plaintiff asserts that she "was clearly qualified to do the job of Comptroller," ECF No. 33 at 8, which is supported by the quality work Plaintiff did for the Company prior to the disputed events, *see id.*, attach. 3 at 9, 18-19. Further, Nanartowich and Goldman "tried [their] best to keep [Plaintiff] there in place[.]" ECF No. 16, attach. 1 at 22. Defendant has asserted "that leading up to her discharge, there were problems with Flynn's performance[.]" *See* ECF No. 37 at 9 (citing ECF No. 16, Def.'s SOF ¶ 34). However, outside of her alleged failure to accept reasonable accommodation, *see* ECF No. 16 at 23, discussed *infra*, Defendant has failed to articulate specific essential tasks that Plaintiff could not perform which made her an unqualified individual, *see id.* at 19-23. Therefore, given the obligation to view the evidence in the light most favorable to the non-moving party, Plaintiff was a qualified individual with a disability unless she is subject to an exception.

Defendant contends that Plaintiff is subject to such an exception and was not a qualified individual because she rejected Defendant's reasonable accommodation efforts. *See id.* at 23. In

---

[16] *See supra* note 5.

order to be considered a qualified individual under the ADA, an employee "must be willing to accept his employer's efforts at reasonable accommodation if the accommodation is necessary for the individual to perform his job." *Roberts v. Cty. of Fairfax*, 937 F. Supp. 541, 547 (E.D. Va. 1996). Accommodation is defined as "[m]odifications or adjustments that enable [the] . . . employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(iii). If an employee "rejects a reasonable accommodation," and the employee "cannot, as a result of that rejection, perform the essential functions of the position, [then] the individual will not be considered qualified." *Id.* § 1630.9(d).

Defendant offered Plaintiff the following accommodations: providing Plaintiff with cash advances totaling over $2,000 for moving costs, *see* ECF No. 16 at 10-11, Def.'s SOF ¶¶ 28-29, referring Plaintiff to Goldman's personal psychiatrist, *see id.* at 11-12, Def.'s SOF ¶ 30, paying for her counseling sessions, *id.* at 11, Def.'s SOF ¶ 31, and hiring a full-time bookkeeper, *id.* at 14, Def.'s SOF ¶ 39. Plaintiff accepted each of these accommodations; therefore, none of these offers by the Company disqualify Plaintiff from being considered a qualified individual with a disability. *See* 29 C.F.R. § 1630.9(d). Defendant also granted Plaintiff six weeks of leave. *See* ECF No. 16 at 13, Def.'s SOF ¶ 34. Because Defendant's employee handbook offered only seven days of paid vacation time, Defendant's offer was an "adjustment" meant to enable Plaintiff to perform her job functions. 29 C.F.R. § 1630.2(o)(iii); *see also id.* § 1630.2(o)(2)(i) (including "part-time or modified work schedules" as a possible accommodation). Defendant alleges that Plaintiff's return to work after only three weeks of leave constituted a rejection of the accommodation, thereby disqualifying Plaintiff from being a qualified individual.[17] *See* ECF No. 16 at 23. However, even

---

[17] Plaintiff, of course, disputes that she returned to work after three weeks without Nanartowich's permission. *See supra* note 11.

if the Court were to consider Plaintiff's return as a rejection of an accommodation, Defendant must also show that Plaintiff's return to work early perpetuated the unacceptable performance. *See* 29 C.F.R. § 1630.9(d) ("if such individual rejects a reasonable accommodation . . . and cannot, *as a result of that rejection*, perform the essential functions of the position, the individual will not be considered qualified.") (emphasis added); *Hankins v. Gap, Inc.*, 84 F.3d 797, 802 (6th Cir. 1996) (holding that an employee was not a qualified individual when the employee did not take time off "and was *thus* rendered incapable of maintaining accuracy, an essential function of . . . [her] job") (emphasis added). Defendant argues that after Plaintiff "showed up, the Company . . . was notified by its bank that user 'Cflynn9' had changed the bank passwords *from a private location*." ECF No. 16 at 23 (emphasis added). Therefore, at least in regards to the TowneBank password change, Plaintiff's return to the office could not have causally contributed to her behavior because the password was not changed from the office location. Any failure to take leave did not perpetuate Plaintiff's error, and therefore, Plaintiff has established this prong of her *prima facie* case, that she may be considered a qualified individual with a disability under the ADA.

### 2. *Whether Plaintiff Fulfilled Defendant's Legitimate Expectations*

In order to establish her *prima facie* case under prong three, Plaintiff must have met Defendant's legitimate expectations at the time of her discharge. *See Haulbrook*, 252 F.3d at 702 (citing *Ennis*, 53 F.3d at 58). Plaintiff asserts that she "fulfilled [Defendant's] . . . reasonable expectations." ECF No. 33 at 9. Although Defendant generally refers to how "both [Plaintiff] and Nanartowich believed that [Plaintiff's] work quality was suffering," Defendant does not claim that Plaintiff failed to meet any of Defendant's reasonable expectations, and there is no written record indicating any performance failures prior to the disputed events. *See* ECF No. 16 at 21; *see also id.*, attach. 1 at 26; *cf.*, *Yeung v. Loudoun Cty. Pub. Schs.*, No. 02-775-A, 2003 U.S. Dist. LEXIS

27004, at *8-9 (E.D. Va. Jan. 17, 2003) (finding that the plaintiff could not show that she met her employer's legitimate expectations because there were at least six written evaluations recording concerns about her performance, and because her employer had informed her that she was in danger of not having her contract renewed). Upon her termination, Nanartowich wrote a strong letter of recommendation on Plaintiff's behalf. *See* ECF No. 33, attach. 2. Therefore, when construed in the light most favorable to the Plaintiff, the Plaintiff has established this prong of her *prima facie* case as she met Defendant's reasonable expectations at the time of her discharge for the purposes of the ADA.

### 3. *Whether the Circumstances Raise a Reasonable Inference of Unlawful Discrimination*

The last prong of Plaintiff's *prima facie* case requires Plaintiff to demonstrate that her discharge occurred under circumstances raising a reasonable inference of unlawful discrimination. *See Haulbrook*, 252 F.3d at 702 (citing *Ennis*, 53 F.3d at 58). Either of the following considerations can create a reasonable inference of unlawful discrimination:[18] (1) evidence of discriminatory animus against the Plaintiff based upon her disability, *see Pettus v. Am. Safety Razor Co.*, No. 5:99CV000103, 2001 U.S. Dist. LEXIS 6968, at *14-15 (W.D. Va. Mar. 29, 2001), and (2) temporal proximity between disclosure and termination, *see Williamson v. Bon Secours Rich. Health Sys.*, 34 F. Supp. 3d 607, 615 (E.D. Va. 2014) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

---

[18] Additional circumstances may also give rise to a reasonable inference of unlawful discrimination, such as sudden hostility towards a plaintiff by a supervisor upon learning of a disability. *See Glunt v. GES Exposition Servs.*, 123 F. Supp. 2d 847, 867 (D. Md. 2000) (citing *Bergstrom-Ek v. Best Oil*, 153 F.3d 851 (8th Cir. 1998); *Crnokrak v. Evangelical Health Sys.*, 819 F. Supp. 737 (N.D. Ill. 1993)). However, these other considerations are not relevant to the instant case.

a.  Evidence of Discriminatory Animus against Plaintiff

Courts have held that evidence of discriminatory animus against a plaintiff can create a reasonable inference of unlawful discrimination when the derogatory comments are made within close temporal proximity of a plaintiff's termination. *See Glunt v. GES Exposition Servs.*, 123 F. Supp. 2d 847, 867 (D. Md. 2000) ("The timing of Plaintiff's perceived decline in performance and the accompanying negative remarks relating to Plaintiff's pregnancy are sufficient to give rise to a reasonable inference of discrimination."); *Pettus*, 2001 U.S. Dist. LEXIS 6968, at *14-15 ("A reasonable juror could find that the events precipitating the plaintiff's discharge and their close relation to the defendant's disability—specifically, the derogatory comments . . . —raise a reasonable inference of discrimination."). While Plaintiff has cited derogatory comments in support of her claim, namely those allegedly made by Mrs. Goldman, those comments are inadmissible hearsay.[19] Furthermore, even if the Court were to consider them, there is no evidence regarding the exact time when Mrs. Goldman allegedly made the comments, nor the impact, if any, they had on the decision maker.

These comments, if considered, also do not constitute direct evidence of discrimination, which would be sufficient to take Plaintiff's claims outside the *McDonnell Douglas* burden-shifting framework. *See Melendez v. Bd. of Educ.*, 711 F. App'x 685, 687 (4th Cir. 2017) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003)).   Direct evidence of discrimination includes "statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."   *Id.* (quoting *Brinkley*, 180 F.3d at 607). Derogatory comments can be considered direct evidence, but only if those comments impugn the

---

[19] *See supra* note 4.

decision maker's intent. *See Merritt*, 601 F.3d at 300; *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 422 n.4 (2011) ("[T]he employer would be liable only when the supervisor acts within the scope of his employment . . . [, citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998),] . . . [but w]e express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influences the ultimate employment decision."); *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155-56 (4th Cir. 2017) (citing *Hill*, 354 F.3d at 290-91) ("[T]his Court has . . . declined to impose cat's paw liability on the basis of a nonsupervisory, biased employee's influence on the ultimate employment decision."). If there is no "clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." *Merritt*, 601 F.3d at 300 (citing *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686-87 (7th Cir. 1991)). Plaintiff has demonstrated no nexus between Mrs. Goldman's alleged comments and Plaintiff's termination; therefore, even if the Court were to consider them, such comments would not constitute direct evidence of discrimination, nor evidence of discriminatory animus on the part of the decision maker.

### b.  Temporal Proximity between Disclosure and Plaintiff's Discharge

Courts have held that temporal proximity between the employee's termination and disclosure of a disability can raise an inference of unlawful discrimination. *See Williamson*, 34 F. Supp. 3d at 615 (finding that the temporal proximity between an employee's termination and his request for reasonable accommodation for his PTSD "suffice[d] to raise a reasonable inference that the request triggered the termination") (citing *Diebold*, 369 U.S. at 655) (internal quotation marks omitted). Therefore, at this stage of the analysis, temporal proximity may be sufficient to establish the fourth prong of Plaintiff's *prima facie* case. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (holding that when the employee's proof of a causal connection is

temporal proximity, the proof does not "conclusively establish[] the requisite causal connection, [but] it certainly satisfies the less onerous burden of making a prima facie case of causality"). Here, Plaintiff has alleged that the temporal proximity between her disclosure of her PTSD diagnosis and her termination raises such an inference. *See* ECF No. 33 at 10.

Such temporal proximity must be "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (quoting *Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). Plaintiff experienced an "exasperation in her mental health" in early 2017, which was at most eight months before her termination. ECF No. 16 at 9-10, Def.'s SOF ¶ 25. On July 3, 2017, Goldman had a meeting with Plaintiff and referred her to his personal psychiatrist just over two months before her termination. *See id.* at 11, Def.'s SOF ¶ 30. Defendant was at least also aware of Plaintiff's hospitalization in August, the month prior to Plaintiff's termination. *See* ECF No. 33, attach. 3 at 20. If the facts are interpreted in the light most favorable to the Plaintiff, and even without determining the exact date Plaintiff disclosed her PTSD diagnosis,[20] these dates may provide a sufficiently narrow window of time to raise an inference of unlawful discrimination for the purposes of establishing prong four of Plaintiff's *prima facie* case. *See Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC*, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) (finding that disclosure five to six weeks before termination could be a factor in determining that the employer discriminated against the plaintiff); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 253-54, 260 (S.D.N.Y. 2009) (finding that the window was sufficiently small to give rise to an inference of unlawful discrimination when the plaintiff suffered her aneurism on March 29 and was

---

[20] *See supra* note 5. As discussed *supra*, the parties dispute when Plaintiff disclosed her specific PTSD diagnosis to Defendant, but the parties do not dispute that Defendant was fully aware of Plaintiff's PTSD-symptomatic behavior. *See* ECF No. 33 at 12 ("[M]uch of [Defendant's] brief consists of a catalog of symptoms of PTSD [Defendant] admits it was aware of."). As discussed at length *infra*, the date of Plaintiff's disclosure of her specific diagnosis is not material because Defendant was aware of Plaintiff's PTSD-symptomatic behavior.

terminated in May); *see also Clark Cty.*, 532 U.S. at 274 ("20 months later suggests, by itself, no causality at all."); *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding no causality in three-month period); *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (finding no causality in four-month period). Therefore, although the temporal proximity here may be very well outside the limits of plausibility, for the purposes of determining whether Plaintiff has satisfied this prong of her *prima facie* case and, viewing the evidence in the light most favorable to her, the Court will consider her to have established that the circumstances surrounding her discharge may raise a reasonable inference of unlawful discrimination under the ADA.

As discussed at length *supra*, Plaintiff has established that she was (i) a qualified individual with a disability who was (ii) discharged by Defendant, that she (iii) met the Defendant's reasonable expectations at the time of her discharge, and (iv) that the circumstances of her discharge raise a reasonable inference of unlawful discrimination. Therefore, the Court **FINDS** that Plaintiff has established a *prima facie* case of discrimination under the ADA.

B.  Defendant's Legitimate, Non-Discriminatory Reason for Termination

As Plaintiff has established her *prima facie* case, the burden shifts to Defendant to show a legitimate, non-discriminatory reason for the termination. *See Ennis*, 53 F.3d at 58. To meet this burden,

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. *See* [*Bd. of Trustees of Keene State Coll. v.*] *Sweeney*, [439 U.S. 24, 25 (1978).] . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth . . . the reasons for the plaintiff's [termination] . . . with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.

*Burdine*, 450 U.S. at 254-56. Defendant has indicated the following reasons for Plaintiff's termination: (1) the password changes, including the TowneBank password and the workstation password, *see* ECF No. 16 at 23-24, and (2) Plaintiff's return to work before her six-week leave

had expired,[21] *see id.* at 30. These reasons were set forth in the Defendant's Motion and Reply,[22] *see id.* at 23-24, and are supported by evidence in the record, *see id.*, attach. 1 at 7-8.

Defendant's explanation "must be legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255. Furthermore, "the defendant bears the burden of production, not persuasion, and the burden can involve no credibility assessment." *Pettus*, 2000 U.S. Dist. LEXIS 20998, at *17 (citing *Reeves*, 530 U.S. at 142). Defendant has produced the reason for Plaintiff's termination; therefore, "[D]efendant [has] carrie[d] this burden of production, [and] the presumption raised by the prima facie case is rebutted[.]" *Burdine*, 450 U.S. at 255. Further, although Defendant has met its burden, "the defendant nevertheless retains an incentive to persuade the trier of fact that the employment decision was lawful. Thus, the defendant normally will attempt to prove the factual basis for its explanation." *Id.* at 258. Defendant has provided evidence in the instant case regarding Defendant's decision to terminate Plaintiff based on the password changes and Plaintiff's premature return to work without permission. *See* ECF No. 16 at 15-17, Def.'s SOF ¶¶ 41-48.

Because the Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, the Court **FINDS** that Defendant has met its burden of production.

C.  Whether Defendant's Legitimate, Non-Discriminatory Reason is Pretextual

After a defendant meets its burden, the plaintiff has an opportunity to show that the defendant's "stated reason . . . was in fact pretext." *McDonnell Douglas Corp.*, 411 U.S. at 804. "[T]he *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s]" at this stage of the analysis. *Reeves*, 530 U.S. at 142-43 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509

---

[21] *See supra* note 11.
[22] By responding to both reasons in her Opposition, *see* ECF No. 33 at 4, Plaintiff has also demonstrated that she understood the reasons proffered by Defendant with sufficient clarity as required, *see Burdine*, 450 U.S. at 254-56.

U.S. 502, 510 (1993)). Therefore, once a defendant has asserted a legitimate, non-discriminatory reason, the plaintiff's *prima facie* case is no longer the focus of the inquiry. *See id.* Instead, on a motion for summary judgment, the Court must resolve "one central question: Has the employee produced sufficient evidence of a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[?]" *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 496-494 (D.C. Cir. 2013).

A plaintiff can demonstrate pretext "directly by persuading the court that a discriminatory reason more likely motivated [Defendant,] or indirectly by showing that . . . [Defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. In *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court clarified the standard:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive . . . [O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated . . . [However,] there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Reeves*, 530 U.S. at 147-48.

Therefore, there are several factors that the Court must evaluate regarding pretext. First, the Court must examine whether Defendant's explanation is the true explanation for Plaintiff's termination. *See id.*; *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Second, the Court must look at whether there is any additional evidence probative of discrimination. *See Ullrich*, 233 F. Supp. 3d at 528 (quoting *Mereish*, 359 F.3d at 335). Third, the Court must examine any factors that support Defendant's case. *See Reeves*, 530 U.S. at 148-49. Finally, the Court

must determine whether these considerations—and all considerations presented in this case—indicate that Plaintiff has met her "ultimate burden of proving that she has been the victim of intentional discrimination." *Smith*, 79 F. Supp. 3d at 599 (quoting *Ennis*, 53 F.3d at 58).

### 1. Whether Defendant's Explanation is Worthy of Credence

If a defendant offers more than one legitimate reason, then the plaintiff must assert sufficient evidence to disprove each one. *See Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("When all legitimate reasons . . . have been eliminated . . . it is more likely than not [that] the employer . . . based his decision on an impermissible consideration[.]"); *Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 594-95 (E.D. Pa. 2009) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) ("[T]o avoid summary judgment, the plaintiff's evidence . . . must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]") (internal citation omitted) (emphasis in original). Defendant has proffered two reasons for Plaintiff's discharge:[23] (1) the password changes, including those of TowneBank and Plaintiff's workstation, *see* ECF No. 16 at 23-24, and (2) Plaintiff's return to work before her six-week leave had expired,[24] *see id.* at 30. Therefore, Plaintiff must offer sufficient evidence to show that each one was not legitimate.

---

[23] Throughout the record, there are occasional suggestions that Defendant may have had related reasons for discharging Plaintiff. *See* ECF No. 16, attach. 45 at 9 (suggesting that "failing to turn over all aspects of the accounting office prior to her leave" and Defendant's "los[s] [of] all confidence in Plaintiff" contributed to Defendant's decision). However, Defendant only clearly articulates in its briefs the two stated reasons for terminating Plaintiff. *See* ECF No. 16 at 23-24 ("At the outset, the Company clearly had legitimate, non-discriminatory reasons for discharging [Plaintiff]: . . . [Plaintiff] violated Nanartowich's instructions not to come back to the office during her six weeks of paid leave. And then . . . the Company lost access to [Plaintiff's] workstation, and its bank informed the Company that [Plaintiff had changed the bank password from a private location."). Although Plaintiff obliquely refers to "a grab bag of assorted other reasons," ECF No. 33 at 4, and "petty post-mortem performance gigs[,]" *id.* at 13, these other reasons are not stated with sufficient clarity for Plaintiff to respond directly, *see Burdine*, 450 U.S. at 254-56. Furthermore, because Plaintiff has failed to proffer evidence sufficiently probative of discrimination under her ultimate burden, *see* § IV.C.4, any additional reasons are not material.

[24] *See supra* note 11.

a.  Password Changes as Justification for Termination

Defendant has asserted that Plaintiff was terminated because Defendant believed that she had changed the TowneBank password. *See* ECF No. 16 at 23-24.  Furthermore, Defendant also believed that Plaintiff changed the password to her workstation. *See id.*  As a business, it was within Defendant's purview to determine how assignments were delegated, the relative importance of each task, and whether certain employee behavior was sufficient for termination. *See EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992) ("It is not for this court . . . to direct the business practices of any company . . . [A defendant is] free to make its business decisions . . . so long as it d[oes] not violate the [ADA].").  Defendant required its comptroller to access TowneBank, *see* ECF No. 16 at 27, Def.'s SOF ¶ 3, and because of the password change, Defendant's acting comptroller was unable to fulfill that task, *see id.*, attach. 1 at 7; *id.*, attach. 4 at 11, 16.  Furthermore, after the password to Plaintiff's workstation was changed, Nanartowich was prevented from accessing the station to check accounting emails. *See id.* at 15, Def.'s SOF ¶ 42.  The relative importance of each of these tasks is within Defendant's purview to determine. *See Clay Printing Co.*, 955 F.2d at 946.

Because it is not the Court's responsibility to determine if the password changes were a "wise, fair, or even correct" decision for termination, the Court does not question the relative importance of a password change in the business setting, only whether "it truly was the reason for the plaintiff's termination." *DeJarnette*, 133 F.3d at 299 (quoting *Giannopoulos v. Brach & Brock Confections*, 109 F.3d 406, 410-11 (7th Cir. 1997)).

In order to show that the password changes were not a true reason, Plaintiff must offer facts showing that Defendant did not honestly believe Plaintiff changed the passwords. *See Corbin v. Fed. Express*, No. 4:15cv139, 2017 U.S. Dist. LEXIS 218068, at *42 (E.D. Va. May 19, 2017)

27

(finding that there were not sufficient facts to show that defendant's reason was not truly the basis for termination when plaintiff "[had] not demonstrated that [Defendant] did not honestly believe that [Plaintiff] violated [Defendant's] policies"). Plaintiff does not contend that Defendant did not believe that she changed the workstation password or the TowneBank password; however, Plaintiff does contend that certain circumstances—such as Defendant's failure to allow Plaintiff the opportunity to refute the password change during the termination meeting, or Goldman's failure to speak with TowneBank himself—create a "strong inference . . . that Nanartowich and Goldman sacked [Plaintiff] under false pretenses[.]" ECF No. 33 at 11. Plaintiff also cites the fact that Defendant's letter of recommendation does not contain anything unsatisfactory regarding her job performance. *See id.* at 6. However, these satellite concerns do not conflict with "the core substance of the employer's articulated justification." *Propst v. WHS Co., Inc.*, 148 F. Supp. 3d 506, 528-29 (W.D.N.C. 2015) (citing *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 212 (4th Cir. 2014); *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *Calobrisi v. Booz Allen Hamilton, Inc.*, No. 1:14-cv-00996, 2015 U.S. Dist. LEXIS 37014, at *15 (E.D. Va. Mar. 24, 2015), *aff'd in part by Calobrisi v. Booz Allen Hamilton, Inc.*, 660 F. App'x 207 (4th Cir. 2016)). As there is no evidence that Nanartowich's belief was dishonest, and no evidence directly conflicts with that stated reason, Plaintiff has not established that this termination reason is not legitimate.

b. Return to Work before Six-Week Leave Expired as Justification for Termination

Defendant has asserted that Plaintiff was terminated because she returned to work before her six-week leave had expired. *See* ECF No. 16 at 30. As a business, it was within Defendant's purview to determine its employees' working hours, including whether to offer its employees additional leave and whether to place any conditions on that leave. *See Clay Printing Co.*, 955 F.2d at 946 ("It is not for this court . . . to direct the business practices of any company . . . [A

defendant is] free to make its business decisions . . . so long as it d[oes] not violate the [ADA].").
Defendant offered Plaintiff six weeks of leave, and Plaintiff only took three weeks, which the
Defendant asserts "brought chaos back into the office." ECF No. 16 at 2. In determining whether
this truly was the reason for Plaintiff's termination, "the relevant inquiry . . . is whether the
employer's . . . actions were taken in furtherance of its own internal goals and policies."
*LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 680 (E.D. Pa. 2016), *clarified by*, *LaRochelle
v. Wilmac Corp.*, No. 12-CV-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016) (citing *Willis v.
UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 641 (3d Cir. 2015)). Even if it has an unfair
effect on the Plaintiff, a chaos-free work environment—so long as it is not achieved through
discriminatory means—is a supportable goal for Defendant. *See DeJarnette*, 133 F.3d at 299
(quoting *Giannopoulos*, 109 F.3d at 410-11) ("[I]t is not [the Court's] province to decide whether
the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the
plaintiff's termination.").

Plaintiff has alleged that this termination reason is not legitimate and has proffered that
Defendant agreed to her early return to work.[25] *See* ECF No. 33 at 4. However, even if Plaintiff
were to disprove each of Defendant's stated reasons, that "does not compel judgment for the
plaintiff."[26] *Reeves*, 530 U.S. at 146 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511). As the
Supreme Court found, "it is not enough . . . to disbelieve the employer; the factfinder must believe
the plaintiff's explanation of intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr.*, 509
U.S. at 519). Therefore, the Court must also discuss whether a jury could reasonably believe
Plaintiff's theories of discriminatory intent.

---

[25] *See supra* note 11.
[26] Regarding how an illegitimate reason—in the presence of another legitimate reason—does not create circumstantial evidence of pretext, see *infra* § IV.C.2.e.

### 2. *Whether There is Additional Circumstantial Evidence of a Discriminatory Reason*

In addition to proving that Defendant's explanation is false, Plaintiff can demonstrate pretext by "offering other forms of circumstantial evidence sufficiently probative of . . . discrimination." *Ullrich*, 233 F. Supp. 3d at 528 (quoting *Mereish*, 359 F.3d at 335) (internal quotation marks omitted).   Plaintiff has offered the following circumstances to indicate discrimination at this stage of the analysis: (1) the temporal proximity between Plaintiff's disclosure and her discharge, *see* ECF No. 33 at 1-2; (2) Mrs. Goldman's animus towards individuals with PTSD, *see id.* at 3; (3) Plaintiff's actual responsibility for changing the password, *see id.* at 7; (4) the promised letter of recommendation, *see id.* at 6; and (5) Defendant's proffer of multiple reasons for termination, *see id.*   Therefore, the Court must examine each to determine whether such sufficient evidence has been provided.

### a.  Temporal Proximity between Disclosure and Discharge

Plaintiff appears argue that the temporal proximity between Plaintiff's disclosure of her PTSD diagnosis and her discharge from Defendant's employment is a determinative issue in this case. *See id.* at 2, 3, 7.   As discussed *supra*, temporal proximity between a plaintiff's disclosure and discharge is sufficient to establish Plaintiff's *prima facie* case.   However, once the Court reaches this stage of the analysis, "temporal proximity, *standing alone*, is insufficient to establish a jury question regarding pretext[.]" *Wright v. Stark Truss Co.*, No. 2:10-cv-2427-RMG, 2012 U.S. Dist. LEXIS 103096, at *23 n.7 (E.D. Va. July 24, 2012) (emphasis in original); *see also Morgan v. Wells Fargo Bank, N.A.*, 585 F. App'x 152, 153 (4th Cir. 2014) (citing *Dugan v. Albermarle Cty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002)) ("temporal proximity alone is not sufficient to establish that her [disability] was a 'but for' cause of her termination").   However, "temporal proximity may be considered as one factor when determining whether Plaintiff has

established a jury question regarding pretext." *Wright*, 2012 U.S. Dist. LEXIS 103096, at *23 n.7 (citing *Reeves*, 530 U.S. at 143).

Defendant argues that "any possible inference of discrimination [through temporal proximity] . . . is entirely negated [because] . . . [Plaintiff] had been disclosing her mental health conditions to Nanartowich for years[.]" ECF No. 37 at 19. Plaintiff was open with Defendant regarding her medical issues throughout her employment. *See* ECF No. 16 at 3, Def.'s SOF ¶ 4. Plaintiff disclosed her anxiety beginning at least in 2015, two years before her termination. *See id.* at 4, Def.'s SOF ¶ 5. Defendant was also aware of Plaintiff's beliefs throughout 2017, *see id.* at 9-10, Def.'s SOF ¶ 25, at least one hospitalization, *see* ECF No. 33, attach. 3 at 20, and her suicidal thoughts, *see id.*, attach. 4 at 28. In fact, both parties appear to agree Defendant was aware of Plaintiff's PTSD-symptomatic behavior well before her termination.[27] When an employer has been made aware of an employee's unofficial health condition previously, temporal proximity between an adverse employment action and any subsequent disclosure of an official diagnosis does not establish pretext. *See Szuszkiewicz v. JP Morgan Chase Bank*, 257 F. Supp. 3d 319, 329 (E.D.N.Y. 2017) (finding that the reason for the plaintiff's discharge was not pretextual when the company had knowledge of plaintiff's mental illness years before his official diagnosis). With Plaintiff's prior disclosures, Defendant "had sufficient notice of [Plaintiff's] mental illness" before the disputed events. *Id.* Therefore, Defendant's knowledge of Plaintiff's PTSD-symptomatic behavior, as well as other mental health issues (particularly those occurring years before the disputed events), undermines Plaintiff's argument about temporal proximity.

Lastly, if "there is an alternative explanation for the timing of plaintiff's termination that is wholly consistent with defendant's reason for terminating plaintiff," then pretext cannot be

---

[27] *See supra* note 5.


established by temporal proximity. *See Watson v. Fairfax Cty.*, 297 F. Supp. 3d 591, 604 (E.D. Va. 2018). Defendant has stated that Plaintiff was terminated for changing the passwords. *See* ECF No. 16 at 23-24. Defendant became aware of the workstation password change on September 6, 2017, *see id.* at 15, Def.'s SOF ¶ 42, and the TowneBank password change on September 7, 2017, *see id.* at 16, Def.'s SOF ¶ 43. Plaintiff was terminated on the following Monday, on September 11, 2017. *See id.* at 17, Def.'s SOF ¶ 48; ECF No. 33, attach. 4 at 20. Therefore, Defendant discharged Plaintiff within a week of the password changes, which is a reasonable termination timeline. "Because there is an intervening event that explains the close proximity of plaintiff's [disclosure] and her termination, this temporal proximity alone does not establish that defendant's legitimate reason for terminating plaintiff is pretext for discrimination." *Watson*, 297 F. Supp. 3d at 604.

### b. Mrs. Goldman's Animus toward Individuals with PTSD

Plaintiff has argued that Mrs. Goldman's alleged animus toward individuals with PTSD is a key consideration in this case. *See* ECF No. 33 at 3. However, as there was insufficient evidence of animus in Plaintiff's *prima facie* case, as discussed at length *supra*, there continues to be insufficient evidence of animus at this final stage of the analysis.[28]

### c. Plaintiff's Actual Responsibility for Changing the Password

Plaintiff argues that the very reason for her termination—specifically, the TowneBank password changes—is "circumstantial evidence sufficiently probative of . . . discrimination." *Ullrich*, 233 F. Supp. 3d at 528 (quoting *Mereish*, 359 F.3d at 335) (internal quotation marks omitted)). That is, Plaintiff argues "that Nanartowich and Goldman actually effected the password change themselves, or had someone do it for them, as cover for the illegal termination."[29] *See* ECF

---

[28] *See supra* note 4.
[29] Plaintiff has not provided any evidence that Goldman or Nanartowich changed the password.

No. 33 at 7-8.  Further, Plaintiff also appears to argue that the extent of Defendant's investigation into Plaintiff's responsibility for the TowneBank password change is probative of pretext, *see id.* at 14, citing facts such as Goldman's failure to speak personally to TowneBank,[30] *see id.* at 14 (citing ECF No. 33, attach. 1 at 3), and Nanartowich's failure to contact Plaintiff on September 7, 2017, about the password change, *see id.* (citing *id.*, attach. 3 at 25-26).

The Court is not concerned with whether Plaintiff actually changed the password.  *See Shell v. Tyson Foods, Inc.*, No. 5:15-CV-00037-RLV-DCK, 2016 U.S. Dist. LEXIS 114033, at *34-35 (W.D.N.C. Aug. 25, 2016).  Instead, the Court is only concerned with whether Nanartowich had an honest belief that she did so.  *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").

Furthermore, courts generally hold that "[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009) (citing *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 859 (8th Cir. 2004)).  While an overly truncated investigation can show that the employer lacked good faith, an employer is free to find "the plaintiff to be less credible" when "there is no evidence to suggest otherwise[.]" *Id.*  Also, "a finding of good faith in an honest belief decision" is "particularly [appropriate] when that decision is independently corroborated." *Id.*  In the instant case, Defendant corroborated the password change with TowneBank. *See* ECF No. 16 at 16, Def.'s SOF ¶ 45.

---

[30] Nanartowich spoke to TowneBank. *See* ECF No. 33, attach. 4 at 3.

To the extent that Plaintiff also contends that the investigation into the workstation password was not thoroughly investigated, the only evidence Plaintiff has proffered is that Nanartowich did not contact her regarding the password change.[31] *See* ECF No. 33, attach. 7 at 5 ¶ 13. However, Defendant has proffered that Nanartowich knew that he had accessed the workstation previously, that Plaintiff had then accessed the computer, and that Nanartowich and Flores had then been unable to access the workstation. *See* ECF No. 16 at 15, Def.'s SOF ¶ 42; *see also id.*, attach. 4 at 48-50. Therefore, Nanartowich concluded that Plaintiff changed the password, and Plaintiff has not provided evidence to dispute his honest belief. *See id.* at 15, Def.'s SOF ¶ 42.

Therefore, because the only evidence in the record establishes that Nanartowich did hold an honest belief that Plaintiff changed the passwords, whether Plaintiff actually changed the passwords is not relevant to this inquiry.

### d.  Promised Letter of Recommendation

Plaintiff argues that Nanartowich's letter of recommendation, prepared after Plaintiff was terminated, creates an argument for pretext because it "lauded praise on [Plaintiff's] performance and gave no hint of anything unsatisfactory at all." ECF No. 33 at 6. Defendant has acknowledged that the recommendation letter provided to Plaintiff is positive in nature. *See* ECF No. 37 at 29 (calling the letter "sparkling"). A positive recommendation letter can support an argument for pretext if the reason given for the plaintiff's termination related to unsatisfactory performance. *See Chipollini v. Spencer Gifts*, 814 F.2d 893, 901 (3d Cir. 1987) (noting that the defendant's recommendation letters praised the defendant despite the fact that supervisors found the defendant "less cooperative . . . then they would have liked"); *see also Scott v. Montgomery Cty. Sch. Bd.*,

---

[31] *See supra* note 12.

963 F. Supp. 2d 544, 556 (W.D. Va. 2013) (citing *Johnson v. Wal-Mart Stores, East, L.P.*, No. 3:10cv659, 2013 U.S. Dist. LEXIS 38620, at *21 (W.D.N.C. Mar. 20, 2013)).  In the instant case, Defendant's proffered reasons for termination may be characterized as alleged unsatisfactory performance because they refer to Plaintiff's behavior (as opposed to general business decisions, like restructuring, that do not refer to specific actions taken by employees).

However, although a positive letter of recommendation can cast doubt on an employer's proffered reason for termination, summary judgment for the employer can still be appropriate if nothing in the record indicates that the employer's decision was discriminatory. *See EEOC v. MCI Int'l*, 829 F. Supp. 1438, 1455 (D.N.J. 1993).  Therefore, the existence of a positive recommendation letter is not dispositive; the Court must weigh the letter with all other evidence presented in the case. *See id.*  The tone of the letter is also relevant, because if a letter "read[s] as a courtesy, not a celebration of a job well done," then a letter of recommendation might well "fall . . . short of generating a trial-worthy issue on pretext[.]" *Wooster v. Abdow Corp.*, No. 94-30060-MAP, 1996 U.S. Dist. LEXIS 3493, at *13 (D. Mass. Mar. 21, 1996).  In this case, the undisputed facts hold that Defendant's recommendation letter for Plaintiff was "exceptional[.]"  ECF No. 16 at 17, Def.'s SOF ¶ 50.

Furthermore, in order to demonstrate pretext in a recommendation letter, the evidence must "speak directly to the proffered reason for the termination[.]" *Campbell v. Fasco Indus.*, 861 F. Supp. 1385, 1399 (N.D. Ill. 1994) (citing *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1223 (7th Cir. 1991) (finding that where the employee was terminated for lack of versatility, a letter of recommendation praising the employee's general performance did not speak to the proffered termination reason)).  Plaintiff has not identified any statements within the letter as conflicting with Defendant's stated reasons for termination. *See* ECF No. 16 at 6.  However, as

Plaintiff was terminated for actions she allegedly took, namely returning to work early and changing the bank account password, the general lack of reference to any unsatisfactory behavior may be sufficient to indicate a conflict.

Regarding the recommendation letter, Defendant argues that the contents are "entirely consistent with Nanartowich's promise to [Plaintiff] during the termination meeting[.]" ECF No. 37 at 10. When the recommendation is consistent with an employer's desire to help the employee in the future, a positive recommendation letter may not be probative of discrimination. *See Ali v. Woodland Heights Med. Ctr.*, 2:05CV206, 2006 U.S. Dist. LEXIS 54763, at *20-21 (E.D. Tex. Aug. 7, 2006) (finding that when employee was fired for low performance scores, a supervisor's "fairly positive recommendation letter . . . does not prove . . . pretext" where the supervisor's "testimony is consistent with his claims that he felt bad about letting [the employee] go and that [the supervisor] wanted to help [the employee]"). During the termination meeting, Nanartowich expressed a desire to "do anything to help [Plaintiff] find a job[,]" ECF No. 16, attach. 2 at 65, and Defendant provided Plaintiff with benefits after her termination, including continuing to pay for Plaintiff's counseling appointments, *see id.* at 17, Def.'s SOF ¶ 51, and giving Plaintiff a month's severance, *see id.* at 17, Def.'s SOF ¶ 49. Further, when Nanartowich promised Plaintiff a recommendation letter, he specifically stated that they "were not going to have any negatives in there[,]" ECF No. 33, attach. 3, at 10 (quoting ECF No. 16, attach. 5 (audio recording on file with court)), and he allowed Plaintiff to request that certain information be included, ECF No. 16, attach. 50 at 3.

Therefore, although a positive recommendation letter can be sufficient basis for establishing pretext, context indicates that the letter may have been provided out of a desire to

assist Plaintiff, and the contents of the letter must be weighed with the other evidence presented in the case.

### e. Proffer of Multiple Termination Reasons

Without determining whether either termination reason is illegitimate, the Court has reason to resolve whether a single illegitimate termination reason may create an inference of unlawful discrimination despite an existing legitimate reason.

First, the mere fact that Defendant "offers an additional reason for the employment decision does not suggest pretext if both of the employer's reasons are consistent." *Ritchie v. Indus. Steel*, 426 F. App'x 867, 872 (11th Cir. 2011) (citing *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998)); *see also Baldwin v. England*, 137 F. App'x 561, 564 (4th Cir. 2005) (finding that pretext was not established when multiple reasons were consistent). Defendant's proffered reasons do not contradict each other; it is possible for Defendant to have terminated Plaintiff based on her return to work before the expiration of the six-week leave as well as based on the password changes. Therefore, Defendant's provision of multiple reasons does not create an argument for pretext.

Second, in examining the proffered explanations, the Court is simply trying to determine "whether the employer gave an honest explanation of its behavior." *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987). A defendant's "effort to document a second reason [for termination] . . . no more shows pretext than a court's resort to a second ground of decision shows consciousness that the first is wrong." *Id.* This is reflected in the requirement that a "plaintiff's evidence . . . allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]" *Atkinson*, 653 F. Supp. at 581, 594-95 (quoting *Fuentes*, 32 F.3d at

764) (internal citation omitted) (emphasis in original). Therefore, allowing a plaintiff's success in disproving one explanation but not another to create an inference of pretext would permit a plaintiff to bypass this essential step in the *McDonnell Douglas* burden-shifting framework.

### 3. Evidence Supporting Defendant's Case

In determining whether the Plaintiff has ultimately been successful in "persuading the [C]ourt . . . of intentional discrimination," *Merritt*, 601 F.3d at 294 (quoting *Burdine*, 450 U.S. at 256), the Court must look at "any other evidence that supports the [Defendant's] case and that properly may be considered on a motion for judgment as a matter of law," *Reeves*, 530 U.S. at 149. Therefore, the Court must examine several additional factors presented by Defendant, including (1) Defendant's favorable treatment of Plaintiff, *see* ECF No. 37 at 19-20, and (2) Defendant's employment of at least one other employee with PTSD, *see* ECF No. 16 at 27.

#### a.  Defendant's Favorable Treatment of Plaintiff

Defendant argues that "any possible inference of discrimination here is entirely negated [because] . . . during the time that [Plaintiff] manifested paranoia and delusions in 2017 . . . Nanartowich was uncommonly kind to her[,]" ECF No. 37 at 19-20, and that "the Company's favorable treatment of Flynn undercuts any inference that it possessed a discriminatory animus against her," ECF No. 16 at 27.

The undisputed material facts demonstrate that Defendant provided the following favorable treatment to the Plaintiff prior to her discharge from the Company, all of which were relevant to her mental health issues: (i) placing Plaintiff in a corporate apartment, signing the lease application, and providing cash advances, *see id.* at 10-11, Def.'s SOF ¶¶ 28-29; (ii) referring Plaintiff to Goldman's personal psychiatrist, *see id.* at 11, Def.'s SOF ¶ 30; (iii) hiring a bookkeeper to assist Plaintiff, *see id.* at 14, Def.'s SOF ¶ 39; and (iv) granting Plaintiff extended

leave, *see id.* at 13, Def.'s SOF ¶ 34. Any favorable treatment prior to discharge will undercut an inference of unlawful discrimination. *See Moticka v. Weck Closure Sys.*, 183 F. App'x 343, 353 (4th Cir. 2006) ("[T]he inference of retaliatory motive is undercut . . . by the favorable treatment [the plaintiff] received from [date of disclosure] until her termination."); *see also Kalola v. IBM*, No. Civ. 7339, 2017 U.S. Dist. LEXIS 29945, at *33 (S.D.N.Y. Feb. 28, 2017) (finding that the employer's bestowal of favorable rating for four years prior to any bestowal of unfavorable ratings undercut the inference of discriminatory motivation in the subsequent unfavorable ratings). Specifically, Defendant's grant of liberal leave to Plaintiff—both to attend counseling appointments before her leave, and the six-week leave itself—"do[es] not support an inference of termination based upon" Plaintiff's disability. *Byington v. NBRS Fin. Bank*, No. GLR-12-705, 2013 U.S. Dist. LEXIS 105080, at *9 (D. Md. July 26, 2013) (citing *Moticka*, 183 F. App'x at 353). Therefore, Defendant's favorable treatment before its decision to terminate her employment undercuts any inference of unlawful discrimination against her.[32]

### b. Defendant's Employment of Other Employees with PTSD

The undisputed material facts demonstrate that Defendant has previously employed at least one individual who had disclosed his PTSD to the Company and who was employed for six years following the disclosure. *See* ECF No. 16, attach. 1 at 36-37. Defendant contends that any inference of unlawful discrimination is undermined because the Company "had [an]other employee[] with PTSD who w[as] not discharged like [Plaintiff.]"[33] *Id.* at 27. If an employer has

---

[32] Defendant also provided the following favorable treatment to the Plaintiff after her discharge from the Company: (i) continuing to pay for Plaintiff's counseling appointments, *see* ECF No. 16 at 17, Def.'s SOF ¶ 51; (ii) giving Plaintiff a month's severance, *see id.* at 17, Def.'s SOF ¶ 49; and (iii) providing Plaintiff with a letter of recommendation, *see id.* at 17, Def.'s SOF ¶ 50. However, the Court is unable find legal support for Defendant's contention that favorable treatment provided *after* an adverse employment action (specifically termination) may serve to undercut an inference of unlawful discrimination.

[33] Defendant has also implied that it tolerates employees with PTSD by providing statistics regarding the relatively high percentage of "war veterans [who] are afflicted with PTSD." ECF No. 16 at 2 n.1. However, Defendant does not state that these employees have disclosed their PTSD to the Company, or that Defendant is aware of the exact

other similarly-situated employees against whom it did not discriminate, that may undermine an argument regarding pretext. *See Ka'Anoi v. Dail*, No. S-07-2722, 2009 U.S. Dist. LEXIS 98941, at *55 n.11 (E.D. Ca. Oct. 23, 2009) ("The fact that plaintiff contends that defendant did not discriminate against other employees with disabilities suggests that defendant's proffered reasons were *not* merely a pretext for disability discrimination against plaintiff.") (emphasis in original). Plaintiff has alleged a general bias against individuals with PTSD despite evidence that Defendant has employed at least one other person with PTSD. *See* ECF No. 33 at 3, 12. Therefore, Plaintiff's argument that pretext exists is undermined by Defendant's employment of another individual with PTSD.

### 4. *Plaintiff's Ultimate Burden*

Despite the burden-shifting framework available under the *McDonnell Douglas* framework, Plaintiff retains "at all times" the burden to persuade the Court that she has been the victim of intentional discrimination. *Merritt*, 601 F.3d at 294 (citing *Burdine*, 450 U.S. at 256). In making the determination whether Plaintiff has met this burden, the Court must look at all the facts and evidence that have been presented in the instant case. *See Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1398 (10th Cir. 1997) ("Each case turns on its facts[.]").

In *Reeves*, the Supreme Court held that "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors[,]" which factors include "the strength of the plaintiff's prima facie case[.]" *Reeves*, 530 U.S. at 148-49. While Plaintiff has established her *prima facie* case, that case is weakened because of the temporal proximity between diagnosis and disclosure, which was the primary evidence Plaintiff proffered under the

---

percentage of Company employees who have had PTSD. *See id.* at 2. Therefore, because perceiving an employee as having a disability is a key requirement under the ADA, any alleged—but unsubstantiated—statistics are not relevant to the instant inquiry. *See Jones*, 214 F.3d at 406 ("[A]n axiom of any ADA claim . . . [is] that the employer be aware of the disability.").

fourth prong. *See* ECF No. 33 at 10. The law requires that the nexus to be "very close," *Clark Cty. Sch. Dist.*, 532 U.S. at 274 (quoting *Neal*, 237 F.3d at 1253), and while the facts potentially create a small window for time of disclosure, the facts also reveal that Plaintiff was disclosing significant mental health issues to Defendant over the course of her five-year employment, *see* ECF No. 16 at 3-4, Def.'s SOF ¶¶ 4-8. Therefore, Plaintiff's *prima facie* case, although established, is relatively weak.

Next, although Plaintiff has offered evidence that may tend to cast doubt on the reasons that Defendant has proffered, namely the "sparkling" letter of recommendation, *see* ECF No. 37 at 29, and her own assertion that Nanartowich granted her permission to return to work, *see* ECF No. 50 at 8 (quoting ECF No. 33, attach. 7 at 5 ¶ 11), the ultimate question is not about disproving Defendant's proffered explanation but rather about proving that discrimination was the real reason, *see Reeves*, 530 U.S. at 146 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) ("[I]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."); *see also Gentry*, 816 F.3d at 235 ("The only remaining question is whether the ADA's text calls for a 'but-for' causation standard. We hold that it does."). While there may be scenarios in which it is "*permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," *Reeves*, 530 U.S. at 147 (emphasis in original), the weakness of Plaintiff's *prima facie* case, combined with the lack of evidence that Plaintiff's disability was the reason for her termination, convinces the Court that even if Plaintiff were to make "such a showing[,]" it would be "[in]adequate to sustain a jury's finding of liability." *Id.* at 148. Put simply, there is no evidence that Plaintiff's disability, specifically her PTSD-symptomatic behavior or her PTSD diagnosis, was the real reason for her termination. Furthermore, the Defendant has provided additional evidence that undercuts an inference of

discrimination, namely Defendant's favorable treatment of Plaintiff prior to her termination and Defendant's employment of at least one other employee with PTSD.

Therefore, no reasonable jury would be able to find that Defendant's real reason for terminating Plaintiff was discrimination based on disability. Therefore, the Court **FINDS** that Plaintiff has failed, ultimately, to demonstrate that she has been the victim of intentional discrimination by Defendant.

## V. RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment, ECF No. 15, be **GRANTED**, and Plaintiff's Complaint, ECF No. 1, be **DISMISSED WITH PREJUDICE**.

## VI. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge will make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

It is so **ORDERED**.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
July 30, 2019